Yongmoon Kim
ykim@kimlf.com
Angela Yu
ayu@kimlf.com
KIM LAW FIRM LLC
411 Hackensack Avenue, Suite 701
Hackensack, New Jersey 07601
Tel. & Fax (201) 273-7117
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FERNANDO ARROYO, *on behalf of himself and those similarly situated*<br><br>Plaintiff,<br><br>vs.<br><br>TROMBERG, MILLER, MORRIS & PARTNERS, PLLC; and JOHN DOES 1 to 10,<br><br>Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

## NATURE OF THE CASE

1. This is a putative class action arising from Defendant's violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.

2. As described more fully below, Defendant violated the FDCPA against Plaintiff and other New Jersey consumers by, *inter alia*, attempting to collect consumer debts when the debts are void, thereby misrepresenting the amount of the debt and attempting to collect amounts not permitted by law.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to entertain this matter pursuant to 15 U.S.C. §

1692k(d) and 28 U.S.C. § 1331.

4. Venue in this action properly lies in the District Court of New Jersey, Newark Vicinage, as Defendants regularly do business in this district.

## PARTIES

5. Plaintiff, Fernando Arroyo ("Arroyo"), is a natural person residing at 188 Lafayette Street, Unit 203, Paterson, NJ 07501.

6. At all times relevant to this lawsuit, Plaintiff was a citizen of the State of New Jersey.

7. Defendant Tromberg, Miller, Morris & Partners, PLLC, ("TMM&P") is a debt collector with a principal place of address located at 39 Broadway, Suite 1250, New York, New York 10006.

8. The Plaintiff is informed and believes, and on that basis alleges, that Defendants John Does 1 to 10 are natural persons and/or business entities all of whom reside or are located within the United States and personally created, instituted and, with knowledge that such practices were contrary to law, acted consistent with and oversaw policies and procedures used by the employees of Defendants that are the subject of this Complaint. Those defendants personally control the illegal acts, policies, and practices utilized by Defendants and, therefore, are personally liable for all of the wrongdoing alleged in this Complaint. Those fictitious names of individuals and businesses alleged for the purpose of substituting names of defendants whose identity will be disclosed in discovery and should be made parties to this action.

9. Some or all of John Does 1-10 set the policies and practices complained of herein.

10. Some or all of John Does 1-10 were actively engaged in the practices complained of herein.

11. In this pleading, "Defendants" in the plural refers to all Defendants.

## FACTUAL ALLEGATIONS

### A. New Jersey Consumer Finance Licensing Act Framework and the Unlicensed Entity

12. N.J.S.A. 17:11C-2 defines the "consumer loan business" as follows:

> "Consumer loan business" means the business of making loans of money, credit, goods or things in action, which are to be used primarily for personal, family or household purposes, in the amount or value of $50,000 or less and charging, contracting for, or receiving a greater rate of interest, discount or consideration therefor than the lender would be permitted by law to charge if he were not a licensee hereunder, except as authorized by this act and without first obtaining a license from the commissioner. *Any person directly or indirectly engaging in the business of soliciting or taking applications for such loans* of $50,000 or less, or in the business of negotiating or arranging or aiding the borrower or lender in procuring or making such loans of $50,000 or less, or in the business of buying, discounting or endorsing notes, or of furnishing, or procuring guarantee or security for compensation in amounts of $50,000 or less, shall be deemed to be engaging in the consumer loan business.

(Emphasis added).

13. N.J.S.A. 17:11C-3(a) provides: "No person shall engage in business as a consumer lender or sales finance company without first obtaining a license or licenses under this act."

14. N.J.S.A. 17:11C-33(b) provides, in relevant part:

> A consumer lender who violates or participates in the violation of any provision of section 3 . . . shall be guilty of a crime of the fourth degree. A contract of a loan not invalid for any other reason, in the making or collection of which any act shall have been done which constitutes a crime of the fourth degree under this section, shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error . . . .

15. All or substantially all of the accounts of which Genesis FS Card Services, Inc. (which officially rebranded as Concora Credit, Inc. in 2023) ("Genesis/Concora" or the "Unlicensed Entity") was involved in were credit accounts with extension of credit less than

$50,000 and provided for rates of interest and/or other charges beyond those authorized by the New Jersey Consumer Finance Licensing Act, at N.J.S.A. 17:11C-1 to -49 for licensed consumer lenders.

16. A significant amounts of these accounts are "retail charge accounts" as defined at N.J.S.A. 17:16C-1(r).

17. Genesis/Concora is in the business of soliciting, taking applications of, negotiating or arranging or aiding in the procuring or making, purchasing, and/or taking assignment of credit accounts, including defaulted accounts, which they then enforce against the borrowers, directly or indirectly, including through collection letters, lawsuits, and post-judgment collection efforts. This is their principal business.

18. In the course of their business, Genesis/Concora has purchased and/or taken assignment of numerous defaulted accounts/debts originally extended by banks or others to New Jersey consumers which were primarily for personal, household, or family purposes.

19. By soliciting or taking applications for such loans, by negotiating or arranging or aiding in procuring or making such loans, by making or purchasing or taking assignment of such loans, and/or by enforcing or collecting such loans, Genesis/Concora acted as "sales finance compan[ies]" as defined at N.J.S.A. 17:16C-1(f).

20. By soliciting or taking applications for such loans, by negotiating or arranging or aiding in procuring or making such loans, by making or purchasing or taking assignment of such loans, and/or by enforcing or collecting such loans, Genesis/Concora engaged in the "consumer loan business" as defined at N.J.S.A. 17:11C-2.

21. During all times relevant to this action, Genesis/Concora was not licensed as "sales finance company[ies]" or "consumer lender[s]" pursuant to the NJCFLA, at N.J.S.A.

17:11C-3.

22. During all times relevant to this action, Genesis/Concora did not comply with the requirements of the NJCFLA.

23. Genesis/Concora engaged in affirmative acts of making and/or collection without complying with the NJCFLA including licensure requirements in violation of N.J.S.A. 17:11C-3.

**B. The Genesis/Concora Credit and Bank of Missouri Rent-a-Bank Scheme**

24. Genesis FS Card Services, Inc., now known as Concora Credit Inc., is a financial technology company that partners with merchants and operates consumer credit card programs under various brand names including Milestone Mastercard, Indigo Mastercard, Destiny Mastercard, and Earniva Business Mastercard. *See* **Exhibit A**.

25. Genesis Financial Solutions and Genesis FS Card Services officially rebranded as Concora Credit, Inc. in 2023. Genesis FS Card Services, Inc. is now Concora Credit, Inc.—the same company operating under a new name. *See* **Exhibit B**.

26. Concora Credit Inc. maintains its principal office at PO Box 4477, Beaverton, OR 97076-4477.

27. The Bank of Missouri is the nominal "issuing bank" that appears on the Milestone credit card accounts and related account statements. *See* **Exhibit C**.

28. However, the actual day-to-day operations, customer relationships, and economic interests in these accounts are controlled by Genesis/Concora, not by The Bank of Missouri.

29. The relationship between Genesis/Concora and The Bank of Missouri is structured such that The Bank of Missouri acts as the "issuer" while Genesis FS Card Services, Inc. runs the day-to-day account operations on the bank's behalf. *See* **Exhibit C**.

30. According to publicly available information, Genesis/Concora does most of the operations that customers deal with day-to-day, including processing applications, managing

billing and payments, hosting customer support, and managing customer service phone lines and mail-in support—in other words, servicing the account on behalf of The Bank of Missouri.

31. Through its Milestone credit card program, Genesis/Concora solicits credit card applications from consumers, including New Jersey residents, through online advertising, direct mail solicitation, and merchant partnerships.

32. Concora's mobile application privacy policy explicitly states that the app is for credit accounts that Concora “service[s] on behalf of the issuing banks,” and specifically identifies The Bank of Missouri as one of those issuing banks. *See* **Exhibit D**.

33. Through its merchant financing platform, Concora partners with retailers to offer point-of-sale consumer financing to customers making purchases. *See* **Exhibit A**.

34. Concora describes its business model as a three-step process: (1) “Becoming a Partner” with merchants; (2) having the merchant's customers apply for credit through Concora's platform; and (3) enabling the merchant to “Do More Business” through the financing program. *See* **Exhibit A**.

35. In Step 1, Concora “work[s] with you to understand your business needs and goals, and determine how our financing solutions can help you achieve them,” then builds and customizes the financing program including “determining the terms, interest rates, and special financing options.” *See* **Exhibit A**.

36. In Step 2, Concora takes applications from consumers through “an easy application process” that “only takes a few minutes to complete,” and Concora's “platform can provide real-time decisions on most applications.” *See* **Exhibit A**.

37. Concora materials state that it supports partners with “processing an application,” meaning Concora runs the application workflow on the program side. *See* **Exhibit E**, page 2.

38. Genesis FS Card Services, Inc. determines the credit accounts' terms, including the interest rates (35.90% APR for Arroyo's account), credit limits, annual fees, monthly fees, and other material provisions. *See* **Exhibit F**.

39. The Bank of Missouri played no material role in setting these terms for Arroyo's Account; all term-setting, underwriting, and approval decisions as to Arroyo were made by Genesis/Concora using its own proprietary platform.

40. As to Arroyo's Account specifically, Genesis/Concora retained the substantial economic interest and bore the risk of loss upon default, as evidenced by the fact that Genesis—and not the issuing bank—acted as the sole "Seller" entitled to all sales proceeds when the account was sold upon default (see Bill of Sale, attached as part of Exhibit F). The Bank of Missouri received no meaningful economic benefit from Arroyo's Account beyond a nominal fee for the use of its charter. All revenue derived from Arroyo's Account—including interest, annual fees, monthly fees, and any amounts collected—inured primarily to Genesis/Concora, which required all account payments and fees to be made directly to its order (see Account Statements which explicitly instructs Arroyo to "Make Check Payable to: GENESIS FS CARD SERVICES," attached as part of Exhibit F).

41. Genesis/Concora underwrote and approved credit applications using its own proprietary underwriting criteria and technology platform.

42. The 35.90% APR far exceeds New Jersey's civil usury caps established by N.J.S.A. 31:1-1, which limit interest rates to 6% per year for loans not evidenced by a written contract and 16% per year for loans evidenced by a written contract specifying the interest rate.

43. The 35.90% APR disclosed on the Plaintiff's Account Statements far exceeds New Jersey's criminal usury caps established by N.J.S.A. 2C:21-19, which limit interest rates to

30% per year for loans except for loans to corporations, limited liability companies, or limited liability partnerships

44. This arrangement—where Concora Credit's branding appears prominently throughout the application and servicing process, while The Bank of Missouri is mentioned only in fine print—demonstrates that consumers reasonably understand Concora Credit, not The Bank of Missouri, to be the entity extending credit.

45. Genesis/Concora Credit, as non-bank entities unlicensed under the NJCFLA, could not legally make loans or extend credit to New Jersey consumers at rates exceeding 16% per annum.

46. The Genesis/Concora Companies structured this rent-a-bank arrangement specifically to circumvent two categories of New Jersey consumer protection laws:

a. the NJCFLA's licensing requirements under N.J.S.A. 17:11C-3, which require any person engaging in the consumer loan business to obtain a license from the New Jersey Department of Banking and Insurance; and

b. New Jersey's civil usury caps under N.J.S.A. 31:1-1, which limit non-bank lenders to a maximum interest rate of 16% per annum on loans evidenced by written contracts.

c. New Jersey's criminal usury caps established by N.J.S.A. 2C:21-19, which limit interest rates to 30% per year for loans except for loans to corporations, limited liability companies, or limited liability partnerships .

47. The Genesis/Concora Companies solicited these rent-a-bank credit accounts in order to evade state usury laws including New Jersey's usury limits by using The Bank of Missouri's charter.

48. The nominal lender, The Bank of Missouri, is a bank and thus exempt from the NJCFLA's licensing requirement under N.J.S.A. 17:11C-6. However, The Bank of Missouri was not the true lender. New Jersey courts have long held that the substance of a transaction controls, and not its form. *Feller v. Architects Display Bldgs., Inc.*, 54 N.J. Super. 205 (App. Div. 1959).

A court will look behind the face of documents to ascertain the actual nature of the transaction to prevent evasion of consumer protection laws. *Green v. Continental Rentals*, 292 N.J. Super. 241 (Law. Div. 1994) (the substance of a transaction determines whether it is usurious).

49. This "true lender" doctrine is applied by courts to combat rent-a-bank schemes, with the central test being which entity holds the preponderant economic interest in the loan. *See, e.g., CashCall, Inc. v. Morrissey*, 2014 W. Va. Lexis 587 (W. Va. 2014). Here, Genesis/Concora—not The Bank of Missouri—held the preponderant economic interest and was the true lender.

50. However, the consumer credit platform through which the accounts were originated and serviced was owned, operated, and controlled by Genesis/Concora Credit.

51. Upon information and belief, Genesis FS Card Services, Inc., and Concora Credit Inc. are Delaware corporations or limited liability companies with their principal place of business in Beaverton, Oregon.

52. At all times relevant to this action, neither Genesis FS Card Services, Inc., nor Concora Credit Inc., nor any of their affiliated entities held a license to engage in the consumer loan business in New Jersey as required by the NJCFLA, N.J.S.A. 17:11C-1, *et seq.*

53. A search of the New Jersey Department of Banking and Insurance website for licensed consumer lenders reveals no license for Genesis FS Card Services, Inc., or Concora Credit Inc.

54. The credit account transaction was structured as a so-called "rent-a-bank" arrangement whereby Genesis/Concora used The Bank of Missouri's bank charter to evade state licensing requirements and usury laws.

55. In a rent-a-bank scheme, a non-bank entity partners with a federally-insured bank

to make loans or extend credit that the non-bank entity could not legally make on its own. The bank's involvement is nominal and temporary, existing only to exploit the NJCFLA's bank exemption from licensing requirements.

56. Without The Bank of Missouri's nominal involvement, Genesis/Concora could not legally:

a. Make consumer loans or extend consumer credit in New Jersey without obtaining a NJCFLA license;

b. Charge interest rates exceeding 16% per annum on credit extended to New Jersey consumers; or

c. Avoid compliance with New Jersey's consumer lending regulations and oversight.

57. If Genesis/Concora had extended credit directly to New Jersey consumers without The Bank of Missouri's nominal involvement, the interest rate would have been limited to 16% per annum under New Jersey law.

58. The rent-a-bank scheme allowed Genesis/Concora to extract interest and fees from New Jersey consumers at rates that would violate the civil and criminal usury statutes if charged by a non-bank lender.

59. Genesis/Concora negotiated, arranged, or aided in procuring credit for consumers by facilitating the transaction between consumers and The Bank of Missouri through its merchant financing platform and application processing system.

60. After origination, Genesis/Concora serviced the credit accounts by:

a. Collecting monthly payments from account holders;

b. Sending billing statements and payment reminders under the Concora Credit brand;

c. Processing payments and applying them to principal and interest;

d. Communicating with account holders regarding their accounts exclusively

through Concora Credit customer service at 800-220-0399 or 1-800-229-0364;

e. Handling any payment disputes or account inquiries through Concora Credit customer service;

f. Managing accounts through default and charge-off; and

g. Serving as the sole point of contact identified on account materials.

61. Concora's mobile app privacy policy confirms that Concora collects extensive personal and financial information from account holders, including name, address, telephone number, email address, account number, user name and password, account activity including transactions and payments, and other personal information used to verify identity. *See* **Exhibit D**.

62. Upon information and belief, Genesis/Concora retained the substantial economic interest in the credit accounts extended to New Jersey consumers and bore the risk of loss in the event of default.

63. Conclusive documentary evidence establishes that Genesis/Concora operated as the de facto owner of these accounts and their underlying receivables. Specifically, pursuant to a Bill of Sale dated June 29, 2023 (attached as part of Exhibit F), Genesis FS Card Services, Inc.—acting as the "Seller"—transferred all right, title, and interest in a bulk portfolio of accounts directly to Credit Corp Solutions Inc.

64. Because The Bank of Missouri was not a party to this Bill of Sale and retained no interest sold therein, The Bank of Missouri necessarily sold, assigned, and transferred all underlying receivables and ownership rights associated with the covered loan accounts to Genesis/Concora prior to June 29, 2023. This total transfer of receivables further confirms that The Bank of Missouri held no preponderant economic interest in the loans and acted merely as a nominal charter-renting vehicle.

65. Upon information and belief, The Bank of Missouri's role was limited to being the

nominal "issuer" on paper, while all substantive aspects of the credit relationship—application processing, underwriting, approval, terms determination, branding, customer service, account servicing, payment collection, and default management—were controlled and conducted by Genesis/Concora.

66. By soliciting or taking applications for consumer credit accounts, by negotiating or arranging or aiding in procuring or making such accounts, by determining credit terms including interest rates exceeding 16%, by servicing and collecting on such accounts, and by purchasing or taking assignment of such accounts, Genesis/Concora engaged in the "consumer loan business" as defined at N.J.S.A. 17:11C-2.

67. N.J.S.A. 17:11C-2 specifically provides that "[a]ny person directly or indirectly engaging in the business of soliciting or taking applications for such loans of $50,000 or less, or in the business of negotiating or arranging or aiding the borrower or lender in procuring or making such loans of $50,000 or less, or in the business of buying, discounting or endorsing notes, or of furnishing, or procuring guarantee or security for compensation in amounts of $50,000 or less, shall be deemed to be engaging in the consumer loan business."

68. By soliciting or taking applications for consumer credit accounts, by negotiating or arranging or aiding in procuring or making such accounts, by servicing and collecting on such accounts, and by purchasing or taking assignment of such accounts, Genesis/Concora acted as a "sales finance company" as defined at N.J.S.A. 17:16C-1(f).

69. The credit accounts extended through the Genesis/Concora platform involved extensions of credit less than $50,000 and provided for rates of interest and/or other charges beyond those authorized by the NJCFLA for licensed consumer lenders.

70. The Account that is the subject of this action was originated under this unlicensed

Genesis/Concora and The Bank of Missouri rent-a-bank scheme.

71. Upon information and belief, the Account was extended to Arroyo through the Genesis/Concora platform, either directly through one of Concora's branded credit card products (Milestone, Indigo, Destiny, or Earniva) or through a merchant financing partnership where Concora determined the terms and serviced the account.

72. The Account bore Genesis/Concora branding, contact information, and servicing, with The Bank of Missouri identified only as the nominal issuer. *See* **Exhibit F**.

73. The Account was subject to an interest rate exceeding 16% per annum. *See* **Exhibit F**.

74. Because Genesis/Concora engaged in the consumer loan business and acted as a sales finance company in New Jersey without obtaining the required license under N.J.S.A. 17:11C-3, Genesis/Concora violated section 3 of the NJCFLA.

75. A violation of section 3 of the NJCFLA in the making or collection of a loan or credit account voids the account and precludes any further right to collect or receive any principal, interest, or charges, pursuant to N.J.S.A. 17:11C-33(b).

76. The Account was therefore void from inception, or upon the first affirmative act by Genesis/Concora in the making or collection of the Account while unlicensed, pursuant to N.J.S.A. 17:11C-33(b).

77. Any subsequent assignment of the Account from Genesis/Concora or The Bank of Missouri to Credit Corp could not cure the void status of the Account under the NJCFLA.

78. The void Account remained void when assigned to Credit Corp, and Credit Corp acquired no enforceable right to collect any principal, interest, or charges on the Account.

79. Credit Corp's status as a licensed entity under the NJCFLA does not cure the void

nature of the Account. The Account became void upon Genesis/Concora's unlicensed activities in the origination and servicing of the Account under N.J.S.A. 17:11C-33(b). The NJCFLA's void provision attaches to the contract at the moment of the unlicensed act—it is not a licensing deficiency that can be cured by subsequent assignment to a licensed party. Credit Corp. acquired the Account with its void status intact and could acquire no greater rights than its assignors possessed.

80. Genesis FS Card Services, Inc./Concora Credit Inc. and Credit Corp Solutions Inc. purchase past-due and defaulted consumer accounts for pennies on the dollar, and then attempt to collect those accounts themselves or through other collection agencies or debt collectors, including law firms such as Defendant TMM&P.

81. Defendant TMM&P, PLLC regularly files collection lawsuits in New Jersey courts, including the Special Civil Part, on behalf of debt buyers seeking to collect charged-off consumer credit card accounts.

**C. The Debt Buying and Collection Industry**

82. The Maryland Court of Appeals described the debt buying industry, consisting of players like Defendant in this case, as follows:

<u>THE DEBT-BUYING INDUSTRY</u>

> Traditionally, when a borrower or customer failed to pay a debt on time, the creditor would do what was needed to collect the debt either by engaging with the debtor directly or by employing an attorney or outside debt collector to do so. That still occurs, of course, but a new business model that first developed in the late 1980s has become predominant in the debt collection universe, largely because (1) so much of the debt arrearage in the United States, and in Maryland, is credit card debt, and (2) Federal banking regulations require credit card companies that are bank-related to charge off credit card debt that has been delinquent for six months.
>
> The new model, for those companies, and others, is to sell their delinquent accounts to debt buyers for pennies on the dollar -

> normally between four and five cents but less for older accounts - and thereby recoup at least something without having to bear the expense of further collection efforts. The sales are in bulk. A three-year study by FTC revealed the sale of more than 5,000 "portfolios" containing nearly 90 million consumer accounts with a face value of $143 billion at a cost of $6.5 billion. *2013 FTC Report* at ii, 8, and Table 2.
>
> While beneficial to the initial creditor in light of the charge-off requirement and lucrative to the debt buyer, the manner in which this new model developed and debt buyers carried on their business created significant consumer protection issues. In its 2013 Report, based in part on a 2009 Study, FTC observed that it received "more consumer complaints about debt collectors, including debt buyers, than about any other single industry." *2013 FTC Report* at i. *See* also *Collecting Consumer Debts - The Challenges of Change, A Workshop Report*. Federal Trade Commission, February 2009 (hereafter *2009 FTC Report*).
>
> In its 2013 Report, FTC noted that, in its 2009 Report, it had expressed concern that debt buyers "may have insufficient or inaccurate information when they collect on debts, which may result in collectors seeking to recover from the wrong consumer or recover the wrong amount." *2013 FTC Report*. The Commission found that, although debt buyers normally receive from the initial creditor the information needed to be disclosed to the debtor under the Federal Debt Collection Practices Act (15 U.S.C. § 1692g) they often do not receive data relating to disputes raised by the debtor or a breakdown of how much of the debt is for interest, fees, or penalties, and that they rarely disclose to the debtor other information, such as data indicating that collection may be barred by limitations, that may be relevant to whether the alleged debtor is the actual debtor or owes the money and, if so, how much. *2013 FTA Report* at iii-iv.

*LVNV Funding LLC v. Finch*, 207 A.3d 202, 206 (Md. 2019).

83. All or substantially all of the accounts of which Defendant took assignment extended credit less than $50,000 and provided for rates of interest and/or other charges beyond those authorized by the New Jersey Consumer Finance Licensing Act, at N.J.S.A. 17:11C-1 to -49 for licensed consumer lenders.

84. In the course of their business, Genesis FS Card Services, Inc. has purchased

and/or taken assignment of numerous defaulted accounts/debts originally extended by banks or others to New Jersey consumers which were primarily for personal, household, or family purposes.

85. When attempting to collect debts, Defendant uses the mail, telephone, the internet and other instruments of interstate commerce.

86. Genesis FS Card Services, Inc. purchases past-due and defaulted consumer accounts for pennies on the dollar, and then attempt to collect those accounts themselves or through other collection agencies or debt collectors.

87. Defendant has asserted that Plaintiff incurred or owed a certain financial obligation originating and which arose from one or more transactions which were primarily for Arroyo's personal, family, or household purposes.

88. Debt collectors like Defendant file hundreds of thousands of collection lawsuits in the State of New Jersey, clogging the State Court’s docket, wasting judicial resources and harassing New Jersey consumers.

89. The Debt alleged to be owed by Arroyo was incurred for personal, family or household purposes.

90. Defendant contends that the Account was past-due and in default when they attempted to collect on it.

91. Defendant is a debt collector under the FDCPA.

**C. Unlawful Enforcement of a Void Debt**

92. On January 28, 2025, Defendant TMM&P, PLLC, acting as attorneys for Credit Corp Solutions Inc., filed a collection lawsuit against Arroyo in the Superior Court of New Jersey, Law Division, Special Civil Part, Passaic County, under Docket Number PAS-DC-001769-25. (“Collection Lawsuit”). *See* **Exhibit G**.

93. Defendant enforced the Debt when it was void.

94. The Collection Lawsuit deprived Plaintiff and other New Jersey consumers of truthful, non-misleading, information.

95. Defendant never informed Arroyo and the court that Genesis FS Card Services, Inc. was not licensed under the NJCFLA.

96. Defendant never informed Plaintiff and the court that the debts were void pursuant to the NJCFLA.

97. Defendant represented to Plaintiff that they were collecting on a valid debt.

98. Defendant represented to Plaintiff that Genesis FS Card Services, Inc. was the lawful creditor.

99. In the underlying State Court Collection Lawsuit, Defendant TMM&P affirmatively alleged to the court and to Arroyo that the Account was assigned to Credit Corp directly from The Bank of Missouri. Specifically, TMM&P alleged that Credit Corp "took by assignment from The Bank of Missouri all the rights, title and interest" and is the "legal assignee of the original creditor." *See* Exhibit G, ¶ 3.

100. This material representation was completely false, deceptive, and legally manufactured. As demonstrated by Exhibit F, Credit Corp did not take an assignment from The Bank of Missouri; it purchased the debt from Genesis FS Card Services, Inc.

101. Defendant TMM&P deliberately fabricated this direct assignment from The Bank of Missouri in its pleading in order to conceal the true chain of title, mask the involvement of the unlicensed entity (Genesis/Concora), and bypass the licensing blocks mandated by the New Jersey Consumer Finance Licensing Act (NJCFLA).

102. Defendant's enforcement of the Account was unauthorized and unlawful because

Genesis FS Card Services, Inc. did not have a license to engage in business as a "sales finance company" or a "consumer lender" pursuant to the NJCFLA, at N.J.S.A. 17:11C-3.

103. The Defendant's enforcement of the Account was unauthorized and unlawful because the Genesis FS Card Services, Inc. did not have a license to engage in collection efforts of the Debt pursuant to N.J.S.A. 17:11C-33(b).

104. By failing to inform Plaintiff that the Debt was void pursuant to the NJCFLA, Defendant frustrated Plaintiff's ability to make an informed decision with respect to his response to Defendant's collection letters and collection lawsuits, and deprived him of the right to enjoy the protections and benefits provided by the NJCFLA and the FDCPA.

105. Despite the Debt being void, Defendant represented to Plaintiff—through written dunning letters and the filing of a collection lawsuit—that the Debt was a valid, existing, and enforceable legal obligation.

106. These representations were material misrepresentations of fact because, at the time they were made, the Debt was void *ab initio* under N.J.S.A. 17:11C-33(b) and Defendant had no legal right to collect.

107. Plaintiff reasonably relied on Defendant's misrepresentations regarding the validity of the Debt.

108. Specifically, relying on the appearance of legal validity created by Defendant's filing of a formal collection lawsuit, Plaintiff retained counsel.

109. Plaintiff expended personal time and resources to investigate the alleged obligation and review his records, treating the Debt as potentially valid rather than immediately dismissing it as void.

110. As a direct result of Defendant's misrepresentation that the Debt was valid and

owing, Plaintiff incurred attorney's fees that he would not have incurred had the debt been disclosed as void.

111. Plaintiff was deceived and threatened into retaining attorneys and incurring expenses like court costs because Defendant sued Plaintiff while hiding material information—that the debts were void pursuant to the NJCFLA—to Plaintiff and the court.

112. As a direct result of this reliance, Plaintiff suffered out-of-pocket damages in the form of costs to investigate the Debt, court fees to defend the void Debt in the Collection Lawsuit, and damage to his creditworthiness. *See*, screenshot of the "Fees" tab of the New Jersey Courts Judiciary eCourts System of the Docket No. PAS-DC-001769-25, attached as **Exhibit H**.

113. As a result of the Defendant's unlawful actions, Plaintiff has suffered an ascertainable loss.

114. As a result of the unlawful collection of the void Debt, Arroyo experienced emotional damages like profound stress, worry, anxiety and embarrassment and suffered ascertainable damages in the form of costs to investigate the Debt, legal fees to defend the void Debt, and damage to his creditworthiness.

115. Specifically, Plaintiff has endured at least one year of ongoing, continuous stress, anxiety, and sleep deprivation as a direct consequence of Defendants' deceptive and unlawful collection practices.

116. The mental burden of defending against a void debt placed an overwhelming strain on Plaintiff during an already demanding period of his life, severely compounding his stress as he navigated regular living expenses, rent, and the baseline pressures of providing for a newborn.

117. As a further result of Defendants' conduct, Plaintiff has experienced acute mental

breakdowns roughly once or twice a month, alongside severe sleep disturbances where he is unable to sleep at all before early morning work shifts.

118. Plaintiff sought to understand the legal basis for Defendant's collection demands, including whether the Debt was legally valid and enforceable. Plaintiff was legally entitled to truthful, non-misleading information regarding the status of the Debt. Defendant denied Plaintiff this information by affirmatively representing the Debt as valid when it was void, depriving Plaintiff of information necessary to make an informed decision about his legal options.

119. Accordingly, attempts to collect a void debt constitutes prohibited conduct under the FDCPA. *See, e.g.*, *Rodriguez v. Pressler, Felt, & Warshaw, LLP*, ESX-L-9033-24, 2026 N.J. Super. Unpub. LEXIS 981 (Law Div. May 7, 2026) ("Plaintiff's FDCPA claims are not attempts to relitigate the NJCFLA defenses against LVNV. Rather, they are based on Pressler's own conduct in filing a collection lawsuit to collect a debt that plaintiff alleges was void under the NJCFLA."); *McCann v. Weltman, Weinberg & Reis Co., L.P.A.*, ESX-L-6083-23, 2024 N.J. Super. Unpub. LEXIS 2403 (Law Div. Oct. 7, 2024); *McQueen v. Fein, Such, Kahn & Shepard, P.C.*, ESX-L-1439-22, 2023 N.J. Super. Unpub. LEXIS 640 (Law Div. April 26, 2023); *Peralta v. Ragan*, No. 1:22-CV-01660-KMW-MJS, 2022 U.S. Dist. LEXIS 234300 (D.N.J. Dec. 30, 2022); *Valentine v. Mullooly, Jeffrey, Rooney & Flynn LLP*, No. 2:20-cv-14152 (WJM), 2022 U.S. Dist. LEXIS 118399 (D.N.J. July 6, 2022) (later dismissed for lack of Article III standing); *Valentine v. Unifund CCR, Inc.*, 2021 U.S. Dist. LEXIS 44747 (D.N.J. Mar. 10, 2021) (later dismissed for lack of Article III standing); *Arroyo v. Stoneleigh Recovery Assocs., LLC*, 2019 U.S. Dist. LEXIS 138287 (D.N.J. Aug.14, 2019); *Tompkins v. Selip & Stylianou, LLP*, 2019 U.S. Dist. LEXIS 21937 (D.N.J. Feb. 11, 2019); *Latteri v. Mayer*, 2018 U.S. Dist. LEXIS 85926 (D.N.J. May 22, 2018); *Nepomuceno v. Midland Credit Mgmt.*, No. 14-05719-SDW-SCM, 2017 U.S. Dist. LEXIS 79307 (D.N.J. May 24, 2017); *Lopez v. Law Offices of Faloni & Associates, LLC*,

2016 U.S. Dist. LEXIS 124730 (D.N.J. Sept. 14, 2016); *Veras v. LVNV Funding, LLC*, No. 13-1745 (RBK/JS), 2014 U.S. Dist. LEXIS 34176 (D.N.J. Mar. 17, 2014).

120. Therefore, Defendant engaged in unlawful practices in violation of the FDCPA including but not limited to 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10), 1692f, and 1692f(1).

## CLASS ACTION ALLEGATIONS

121. Plaintiff brings this action individually and as a class action on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

122. Subject to discovery and further investigation which may require Plaintiff to modify the following class definition at the time Plaintiff moves for class certification, Plaintiff seeks certification of a class and a subclass initially defined as follows:

> **FDCPA Class**: All natural persons with addresses in the State of New Jersey who are listed as the borrower, accountholder, debtor, or purchaser of a debt involving Genesis FS Card Services, Inc., or any of its sister or parent entities, at any time the respective entity was not licensed under the New Jersey Consumer Finance Licensing Act, who were subject to collection including but not limited to collection emails, collection letters, collection calls/texts, collection lawsuits, and/or credit reporting by or on behalf of Defendant on or after January 28, 2025, through and including the final resolution of this case.

123. Plaintiff seeks to recover declaratory relief on behalf of the class and attorney's fees and costs to the extent allowed by law.

124. Plaintiff seeks to recover statutory damages, actual damages, restitution and attorney's fees costs on behalf of himself and all subclass members under the claims asserted herein.

125. The Class for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

126. There are questions of law and fact common to the members of the Class that predominate over questions affecting only individuals, including but not limited to.:

a. Whether Defendant is a debt collectors under the FDCPA;

b. Whether Defendant violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10), 1692f, 1692f(1), 1692g, and 1692g(a)(1).

127. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. A class action will cause an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense by avoiding thousands of individual suits that will be based on the same legal theories that can be resolved in a single proceeding.

128. Plaintiff's claims are typical of the claims of the members of the Class.

129. The questions of law and/or fact common to the members of the Class predominate over any questions affecting only individual members.

130. Plaintiff does not have interests antagonistic to those of the Class.

131. The Class, of which Plaintiff is a member, are readily identifiable. Credit Corp Solutions Inc. has records of each account that it acquired when Genesis FS Card Services, Inc. did not hold a license.

132. Plaintiff will fairly and adequately protect the interests of the Class, and has retained competent counsel experienced in the prosecution of consumer litigation and class actions. Proposed Class Counsel have investigated and identified potential claims in the action; have a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

133. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, which would establish incompatible standards

of conduct for the Defendants in this action or the prosecution of separate actions by individual members of the class would create the risk that adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Prosecution as a class action will eliminate the possibility of repetitious litigation.

134. Plaintiff does not anticipate any difficulty in the management of this litigation.

## FIRST COUNT
## Violation of the Fair Debt Collection Practices Act

135. Arroyo repeats and realleges all prior allegations as if set forth at length herein.

136. Defendant is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

137. The Debt is a "debt" within the meaning of 15 U.S.C. § 1692a(5).

138. Arroyo is a "consumer" within the meaning of 15 U.S.C. § 1692a(3).

139. The collection lawsuit or dunning efforts are a "communication" as defined by 15 U.S.C. § 1692a(2).

140. By attempting to collect void consumer debts, Defendant violated the FDCPA including sections 1692d, 1692e (including 15 U.S.C. §§ 1692e(2)(A), 1692e(5), 1692e(10)), and 1692f (including section 15 U.S.C. § 1692f(1)) of the FDCPA.

141. Defendant further violated 15 U.S.C. §§ 1692e, 1692e(2)(A), and 1692e(10) by falsely representing the chain of title in a legal pleading, specifically claiming that the debt was assigned directly from The Bank of Missouri to Credit Corp, when in truth, the receivables had been sold to and were transferred by Genesis FS Card Services, Inc., thereby misrepresenting the legal status and origin of the alleged debt.

142. Based on any one of those violations, Defendant is liable to Plaintiff and the Class for statutory damages, actual damages, and attorney's fees and costs under 15 U.S.C. § 1692k.

**WHEREFORE**, Arroyo, on behalf of himself and the putative Class members hereby requests a Judgment against Defendant,

a. An award of statutory damages for Plaintiff and the Class pursuant to 15 U.S.C. § 1692k(a)(2)(A) and § 1692k(a)(2)(B)(i);

b. An award of actual damages for Plaintiff and the Class;

c. Attorney's fees, litigation expenses, and costs pursuant to 15 U.S.C. § 1692k(a)(B)(3);

d. For pre-judgment and post-judgment interest; and

e. For such other and further relief as may be just and proper.

## SECOND COUNT
## Fraud

143. Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

144. By taking possession of Arroyo 's Account and attempting collection of the same, the Defendant made material misrepresentations that they had the legal right to possess and collect the alleged Debt when they did not.

145. By taking possession of the Class members' alleged accounts and attempting collection of the same, Defendant made material misrepresentations that they had the legal right to possess and collect the alleged debts when they did not.

146. By taking possession of the Class members' alleged accounts and attempting collection of the same, Defendant made material misrepresentations to the Class members that the debts were valid when the debts were void.

147. By taking possession of the Class members' alleged accounts and attempting collection of the same, Defendant made material misrepresentations to the Class members that Credit Corp Solutions Inc. was the lawful creditor when they were not.

148. In attempting to enforce and/or collect the Class members' alleged debts,

Defendant intended that the Class members rely on their material misrepresentations that Defendant had the legal right to possess and collect on the Class members' alleged accounts.

149. The Class members reasonably relied on Defendant's material misrepresentations that they were legally allowed to attempt enforcement of the Class members' alleged debts.

150. The Class members have been damaged as a result of their reasonable reliance on Defendant's misrepresentations that they had the legal right to attempt collection of the Class members' alleged debts when they did not.

151. By taking possession of the Account and attempting collection of the same, the Defendant made material misrepresentations to Arroyo that the Debt was valid when the Debt was void.

152. By taking possession of Arroyo 's alleged Account and attempting collection of the same, the Defendant made material misrepresentations to Arroyo that they were the lawful creditor when they were not.

153. At the time Defendant made these misrepresentations, the Debt was already void and unenforceable due to the unlicensed activities of Genesis FS Card Services, Inc.

154. At the time Defendant took possession of Arroyo's alleged Account, Defendant knew or should have known that the Debt was void.

155. Arroyo reasonably relied on Defendant's material misrepresentations that they were legally allowed to attempt enforcement of the alleged Debt.

156. Arroyo relied on Defendant's misrepresentations that the Debt was valid by refraining from taking earlier legal action to declare the Debt void, thereby allowing interest and fees to improperly accrue on the alleged Debt.

157. Arroyo relied on Defendant's misrepresentations that the Debt was valid by

expending personal resources to investigate the alleged Debt rather than immediately dismissing it as void.

158. Arroyo has been damaged as a result of his reasonable reliance on the Defendant's misrepresentations that they had the legal right to attempt collection of the alleged Debt when they did not, including the attorney's fees and costs to defend this action.

159. Arroyo has suffered pecuniary losses in the form of costs associated with investigating the invalid Debt and out-of-pocket expenses and legal costs incurred to defend against a lawsuit that was based on a legally void instrument.

160. Arroyo has sustained damages in that his creditworthiness has been negatively affected.

**WHEREFORE**, as to Count Two, Plaintiff, on behalf of himself and the Class members. hereby requests a Judgment against Defendant,

a. Granting class certification of the class under Rule 23 of the Federal Rules of Civil Procedure;

b. A money judgment for compensatory damages based on Defendant's material misrepresentations and Plaintiff's resulting reliance and damages;

c. A money judgment for punitive damages based on Defendant's material misrepresentations and Plaintiff's resulting reliance and damages;

d. For attorney's fees, litigation expenses and costs in connection with this action;

e. For pre-judgment and post-judgment interest; and

f. For such other and further relief as the Court deems equitable and just.

## THIRD COUNT
## Fraudulent Inducement

161. Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

162. By taking possession of Plaintiff's alleged account and attempting collection of the same, Defendant made a material misrepresentation of a presently existing fact to Plaintiff

that they had the legal right to possess and collect Plaintiff's alleged debt when they did not.

163. By taking possession of the Class members' alleged account(s) and attempting collection of the same, Defendant made a material misrepresentation of a presently existing fact to the Class members that they had the legal right to possess and collect the Class members' alleged debts when they did not.

164. At the time Credit Corp Solutions Inc. took possession of Plaintiff's alleged account, Defendant knew that the debt was void.

165. In attempting to enforce and/or collect the Class members' alleged debts, Defendant intended that the Class members rely on their material misrepresentations that Defendant had the legal right to possess and collect the Class members' alleged accounts.

166. The Class members reasonably relied on Defendant's material misrepresentations that they were legally allowed to attempt enforcement of the Class members' alleged debts to their detriment.

167. In attempting to enforce and/or collect Plaintiff's alleged debt, Defendant intended that Plaintiff should rely on their material misrepresentations that Defendant had the legal right to possess and collect Plaintiff's alleged account.

168. Plaintiff reasonably relied on Defendant's material misrepresentations that they were legally allowed to attempt enforcement of Plaintiff's alleged debt to his detriment.

**WHEREFORE**, as to Count Three, Plaintiff on behalf of himself and the Class members hereby requests a Judgment against Defendant,

a. Granting class certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

b. A money judgment for compensatory damages based on Defendant's false misrepresentations and Plaintiff's resulting reliance and damages;

c. A money judgment for punitive damages based on Defendant's false

misrepresentations and Plaintiff's resulting reliance and damages;

d. For attorney's fees, litigation expenses and costs in connection with this action;

e. For pre-judgment and post-judgment interest; and

a. For such other and further relief as the Court deems equitable and just.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues subject to trial by jury.

**CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, except the cases styled:

- *Credit Corp Solutions Inc. v. Fernando Arroyo,* PAS-L-2686-25 (formerly PAS-DC-1769-25) (N.J. Super Ct. Law Div.); and
- *Fernando v. Concora Credit, Inc.* BER-L-1664-26 (N.J. Super Ct. Law Div.).

Dated: June 18, 2026

KIM LAW FIRM LLC

*s/Angela Yu*
Angela Yu
*Attorneys for Plaintiff*